Our fourth case for this morning is Fifth Third Mortgage Company against Ira Kaufman. Mr. Radjanovich? Yes. Good morning to the court. May it please the court. My name is Rod Radjanovich. I represent Mr. Ira Kaufman in traditional title. I think a threshold issue in the case of Barr here is, did the district court err in changing, sui sponte, changing the cause of action, the plaintiff's theory of liability after trial and after the closure of evidence? The underlying case was tried, the seven counts against traditional title in Mr. Kaufman were seven counts of common law fraud. The case proceeded for five years. It was to a second amended complaint. It was still the same seven common law fraud counts. Each of those counts, counts four through ten, lumped numerous defendants together. There were ten defendants, I think by my count, and they were all lumped into these same common law fraud counts. Only Mr. Kaufman and traditional title went to trial. Why haven't you waived this claim about changing the theory because you raised it for the first time in your reply brief here? Well, in the response brief, we filed a Rule 59 motion after trial where we raised this issue that aiding and abetting had never been presented at trial or at the court. So we did present it in a Rule 59 motion. But before this court, you raised it for the first time in your reply. Yes, and in the response, Fifth Third filed a response and had issues presented. The first issue presented was, did traditional title and Mr. Kaufman waive this issue of aiding and abetting because they had never presented it at trial? And I believe under Rule 28, I read the Bennett case and the Loya case. In the response, there was a new issue injected into this appeal. And so I believe we have not waived that issue. And so our threshold issue here is, so I don't believe that we've waived this issue, whether the district court erred, by injecting it nine months later in the findings of fact and conclusions of law. You argue that it's a different claim, but under Illinois law, aiding and abetting is just a theory of proving the underlying fraud claim. It's not a separate claim. I disagree. I think even this court in Hefferman recognized that Illinois law does recognize a cause of action for aiding and abetting a tort. There has to be an underlying tort. There's no independent action for aiding and abetting. How do you get rid of Hefferman? Hefferman says one who aids and abets a fraud is guilty of the tort of fraud. And I think the way Judge Sinew just put it is consistent with the Illinois cases. Hefferman, the sites in Hefferman were a lot of federal law cases. After Hefferman, and Hefferman recognized it in Thornwood versus Jenner and Block, the Illinois courts did recognize, have recognized the existence of an aiding and abetting tort cause of action. I cite Stoler v. Johnson, another case, recent cases that recognize that there is a court, there is a cause of action for aiding and abetting a tort under Illinois law. It's a separate question from what we're arguing here is that there's no case here that's found an attorney liable for aiding and abetting his client. But Judge Kennelly goes out of his way to say that that's not a proper characterization of his findings. He finds that Mr. Kaufman, sort of on his own account, as an individual, perhaps wearing a different hat from his hat as attorney or his hat as a member of the LLC, is engaged in conduct designed to enrich him personally. He's engaged in conduct that's helping this group carry forward with their fraudulent transactions with respect to these buildings, the number of condo units that he knows perfectly well, that you can't be the primary resident of six or seven units at the same time, and all sorts of things. But essentially that he's acting on his own account, and this is not the simple, clean case of just the mere member of the LLC or just an attorney-client where the attorney files a brief and may be helping the client, but certainly isn't helping in a fraudulent scheme. And that's what Judge Kennelly said at the hearing on the Rule 59 motion. But the findings of fact and conclusions of law say something else. He found Mr. Kaufman a dual liability, one as a member owner of traditional title, the title company, and as the seller's attorney. His quote, his language was, by failing to fulfill the duties of traditional title, Mr. Kaufman, for counts four and five, aided and abetted a tort here. Quote, failure to report to Fifth Third substantially assisted the mortgage fraud. So this way, this already goes well beyond, let me give you this hypothetical to show why I think it does. This is not an instance of being held liable solely because you're a member of an LLC. The example I would give, suppose this LLC had two members. One of them lived in Chicago and the other one lived down in Texas. And the person in Texas just sits there and lives their life in Texas, isn't involved at all with this fraud. The one in Chicago is engaged in facilitating the fraudulent transactions. You're not going to hold the Texas person liable merely because that individual happens to be a member of the LLC. I think that's what the Illinois statute's getting at. Mere membership doesn't mean that you were engaged in any particular activity. Well, I think, and I cite Doss v. Yale, and there there was a case where the member of the LLC, it was a purchase of a home, personally made misrepresentations to the buyer. The buyer sued the LLC and Mr. Yale, Doss v. Yale, for common law fraud and statutory fraud. And there the plaintiffs argued that Mr. Yale would be liable if he acted individually and that defrauding while being a member should not provide protection, that he was doing this as an individual, not as a member of the LLC. And that argument was rejected by Doss v. Yale because under the LLC Act, there's a section 1010D and it says that unless, there's no personal liability unless a provision is included in the articles of incorporation and the member has consented in writing to be bound by personal liability. And that, this is different. But the Act says that a member of the LLC is not personally responsible for the LLC's debt obligation or liability solely because that individual is a member of the LLC. That is not what Judge Kennelly found here. Or by acting. He didn't find the LLC liable and then impose that liability on your client because he was a member. He found your client personally liable because of the actions that he took and didn't take, which is very different. By not alerting or notifying a third of these concerns. There were contractual reasons why he might have had that duty, but he certainly creates a system. He's a big player, actually, in a system that results in parting Fifth Third Bank from quite a bit of its money. Going back, there was an amendment to the Act in 1998 where the Illinois legislature actually took out a clause, and I cited in my brief, where there was personal liability just as like for a shareholder of a corporation. And the DAS court said that after this amendment, that the plain language of the Act and 1010D provided an immunity here, that Mr. Yale here, even though he made this misrepresentation as an individual, he was not liable because of 1010D. And so I believe in the response brief, Fifth Third cited the Uniform Act, Section 303, and the comment here. The comment, right. It's not in the Illinois Act. solely because of your membership. How is it that you're not responsible for your own actions? An act while acting as a member of an LLC, for example, the title company. So you could commit murder as a member of an LLC, and that would all be fine? Well, the response brought up a car accident, and while driving a car and hitting someone while working for the LLC, I think you have a duty to pedestrians that's separate and apart from whatever your responsibilities or your role is with an LLC. And in this case, Mr. Kauffman, the allegations here is he owned a title company. The closers there did not suspend or notify Fifth Third that there was some activity, suspicious activity. But Judge Cannelli made clear that his holding was not based on Mr. Kauffman's capacity as an owner or member of the LLC. It was based on his personal actions. But in the findings of conclusion, the findings and conclusions of law, there was a dual analysis. In his role, counts four and five. That's because there was also a claim against the LLC, so he was addressing both. Sure. And he found there was language in the opinion where he imputes the knowledge of the closers and Mr. Kauffman to the LLC, finds the traditional title is liable for aiding and abetting, and then says, Mr. Kauffman, this is in the findings of fact, is also jointly and severally liable for participating in the fraud as a member of the company. Reading this opinion was, it was for what he did or he didn't do as a member of the LLC. But it wasn't because of the LLC's liability. It was because of his own personal actions that he took. Judge Cannelli didn't say, I'm finding the LLC liable for this amount, and because you're a member, you're liable too. He said, you're liable because here are all the things you did and you didn't personally do. He found the LLC liable because the closers, Mr. Lee and Mr. Martinez and Mr. Kauffman, did not suspend or notify Fifth Third. And that's why traditional title was found liable. These were employees. Mr. Kauffman was a member or owner of the company. So that's what his liability was. The district court said, by failing to fulfill the duties of traditional title as an owner or an employee, and that was the basis of that liability. Counts 6 through 10 where traditional title was not involved and it was just his role as an attorney. Okay, you might want to save just a little bit for rebuttal. Sure. Thank you. And you can sit at the council table. Mr. Darcy. Good morning. Let me just jump in where you left off there. The fact that's being omitted from that description of what happened was that Mr. Ahmed implicated Mr. Kauffman in the crime. And that testimony was extraordinarily difficult to get. If you remember, Mr. Ahmed was under indictment almost the entire case. He had pled guilty, but he hadn't been sentenced. So the entire case, we were afraid that he was going to assert the Fifth Amendment. And the day that he got sentenced, we basically deposed him like the next day. And that's the testimony that came into the case. And that's the testimony that shows that Mr. Kauffman knew from the get-go that the entire operation was fraught. And it's that testimony that the district judge credited, which is really the final nail in the coffin for Mr. Kauffman. No pun intended. Importantly, we did not interject a new theory of liability in the closing argument. Our intention was just to show that the tort of fraud was broad enough to encompass aiding and abetting. And if you read our Second Amendment complaint, it reads that Kauffman aided and abetted and assisted others in fraud all the way through. And it starts right at the beginning. I mean, it just goes right from the get-go all the way through. And I can direct you to specific pages if it's helpful. It starts on page 5. We say that it's a massive scheme where a bunch of defendants got together and defrauded banks, all dressed up with the trappings of legitimacy. So what exactly did Mr. Kauffman do that any lawyer would not have done as the attorney for the seller of these units? Well, it's the fact that he knew that the proceeds that he was receiving himself were the proceeds of a fraud. In other words, let's say we all get together right now. So he knew the price was phony and the applications were phony and everything. Right, exactly. You know, if we got together right now and half the room said they were going to go rob a bank, and I said, okay, when you get back from the bank, I'll draw up a document where we all share the proceeds. And by the way, normally I charge $500 for that, but this time I'm going to charge $60,000. So what do you say to that? And you say yes because you've already robbed the bank. So that's what happened here. And, you know, on an equity basis, I mean, what happened here was just outrageous. I mean, these young women, they were 22-year-old high school graduates working as cocktail waitresses in bars in Chicago. Mr. Ardy got less than $40,000. She received almost a four-year sentence. Mr. Ahmed, who received $1.8 million of fraudulent proceeds, gets 18 months in prison. I mean, Kaufman, for some reason, doesn't get indicted, even though he's in the midst of it. And the testimony that's not highlighted by the judge was that Kaufman actually arranged those subsequent closings. In other words, he structured that idea that high-point developers would receive those huge payouts. Remember, it's totally unclear that high-point developers did anything. So was he doing this on behalf of the LLC, or was he doing this on his own? He was doing both. I mean, to the extent it's on behalf of the LLC, why doesn't this rather broad immunity that Illinois recognizes protect him? Because he's not acting solely for the LLC. He's acting for himself because he gets increased compensation through the title fees and through the agent fees and then through the attorney's fees. So he's enriching himself on the backs of the banks, not just Fifth Third, but all the other banks that were defrauded as well. And so this notion that— Were any of the other banks bringing comparable lawsuits, or was Fifth Third disproportionately harmed by this scheme? A lot of the banks failed. Several of the banks failed. Remember, this came out of the Great Recession. Several of the banks failed. There was an evidentiary issue with Chicago Title. It was a great mystery how the U.S. Attorney's Office got involved in the first place. It turned out they had done a very thorough investigation and concluded that it was a massive fraud. And then they tried to hide that report from us. This case is a small novel, but you'll see in the record that they were sanctioned $10,000. That was because they hid the report. We subpoenaed the employee that did the report, who was a former employee who lived in Florida. And when that person had left his job, he had taken his investigation with him. And so he produced the investigation at his deposition. That's the only reason that we have— This is a former U.S. Attorney's Office person? No, no. He's a former Chicago Title fraud auditor who had mapped the fraud. I mean, Chicago Title was obviously concerned about their own liability in the case. But you didn't sue them, did you? We did. We did sue them. You did sue Chicago Title? And we settled. So going back to counsel's point, which is that we only introduced the aiding and abetting to show that fraud encompasses that under Illinois law. And there's no question that we pled those facts all the way through the complaint. So this notion that somehow they got sandbagged at the 11th hour is completely false. They defended a trial—Coffman stipulated a trial that the fraud occurred. His entire defense was that he didn't know about it. And he told a grand whopper of a lie that on January 2, 2009, he got a call from Mr. Ahmed to defend the development at 4725 South Michigan from a housing inspection. And that's not what the scheme was. That whole lie pretends that the scheme was to flip the properties. This was not a flipping property. This was a smashing grab. Like as soon as those deals closed, that was the scam because these were all first payment defaults. So by that time, January 2, 2009, all those loans at 4729 South Michigan, that's 27 loans, they were all in default. So in the record, it indicates that the timing had to be careful to make sure that the credit agencies didn't catch up with these applications. Fifth Third must have had some ability to monitor loans at a particular property as well. If they're all suddenly defaulting, does Fifth Third do anything? It takes a long time to piece it all together because I don't think they categorize their loans by address. So then you start looking at the broker, and then you start seeing that the brokers are the same brokers. And then you start getting into it, and you have to unpeel the layer of the onion. Do they have any system when the loans are taken out in the first place to identify them as all coming from the same property and many of them the same individuals? Well, remember that 4725, we only had two. Maybe we had three. We may have had one, a Finerra loan as well, but that we didn't find out about until late. So we only had two of the 27. But the trick is that it's the lien filing that the services are picking up on. So the mortgage lien file, that's what's triggering the mark on the borrower's credit report. So it's just they don't do that on a daily basis. I don't know if they do it weekly or monthly, but that's what the lag time is. That's why that fraud's not immediately spotted. And you see this in other kinds of economic fraud. But in the equipment industry, you see this is called deal splitting. You submit the application simultaneously to a whole bunch of different lenders, and the lenders can't tell that the deal's been submitted simultaneously. So the borrower gets approved for ten times the debt that they're actually qualified. So it does seem that Mr. Kaufman's not really the ringleader. It's really Mr. Ahmed, right? It's Ahmed and Mr. Higueros. Higueros. Yes. Who's not in the country anymore, as far as I recall. Correct, correct. Yeah. Correct. But not an incidental player because, remember, the whole thing's a waste of time if the deals don't close. And you need an attorney who's in the loop to close the deals because if there's no closing, if there's no HUD one that the lender signs off on and funds the deal, then no one gets paid. So you've done all this effort. And the effort was tremendous. I mean, the other element of 4725 that's not emphasized in the record, those units were gutted. They were never finished. There's actually no condo there. So if you walk down there, it would just be like a construction site. So the appraisers were in on the fraud. So they appraised those units out at the price, even though they were never finished. So that's how extensive the fraud was. So I think we describe it as a ballet, and I think that's accurate. The appellant makes one other argument that wasn't addressed earlier, which is that an attorney can't aid and abet the fraud of their client. Right. I mean, you have the Thornwood case in Illinois. Is there anything else? Well, this court, way back in 1934 in the Walgreen case, concluded that an attorney could aid and abet their client conducting a fraud. In other words, if the attorney is acting for their own interest, the attorney is liable. And here it's very clear that Coughlin was acting in his own interest and knew in advance that this was a fraud and that the proceeds he received were from the fraud. His cut, so to speak. Yes, and the implications of that, like he has no e-mails, he has no client files, he has no conflict waivers for his clients. He has nothing. So the idea that he didn't hide all that information from the court can be inferred. Thank you very much. All right. Thank you. Anything further, Mr. Regenevich? Regarding aiding and abetting an attorney, aiding and abetting his client's tort, I cited two cases, Alonzo v. Weiss and Scanlon v. Eisenberg. In Alonzo, Judge Lefkoe addressed it in a footnote and recognized that there's no Illinois Supreme Court case that's ever had a determination regarding whether there could be a liability for an attorney for aiding and abetting his client. Judge Grady differed and he predicted that the Illinois Supreme Court would recognize such a tort. Now, there is, obviously, this isn't quite on point, but even the ethical rules of the bar understand that attorneys might be involved in a crime or a fraud that a client's going into. I guess you have to say, well, maybe that allows them to breach the lawyer-client confidentiality, but that's where it stops. Rule 1.6c says a lawyer must disclose or inform authorities if his client is going to hurt someone or kill someone. 1.6a, I believe, of the Illinois Rules of Confidentiality has a list. An attorney may disclose discretion if his client is involved in some kind of fraud or other things. It is discretionary. No, as I said, it's not quite on point. It does suggest that there's a recognition that such things go on. Then taking the next step, that would be the question, well, suppose for the attorney's own account, so to speak, wearing his individual hat, he's a participant. I don't see why an attorney couldn't be. Well, Judge Lefkoe and Judge Grady addressed this issue. The Illinois Supreme Court has ruled that an agent and principal cannot conspire with each other. It's a civil conspiracy. I cite the Edelman case or whatever where that was the Buckner case, Buckner versus Atlantic. There could be no conspiracy between a principal and agent because the acts of an agent are considered the acts of a principal. It's a complicated area, I'll just say. Maybe you should wrap up. And I would say for the same reason, aiding and abetting the acts of an agent are the acts of the principal. Thank you very much. Thank you very much. Thanks to both counsel. We'll take the case under advisement.